UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

                                      Case No. 1:17-cr-271-1

v.

                                      HON. JANET T. NEFF

NOEL FRANCISCO SALDANA,

     Defendant.

_____/

**SENTENCING MEMORANDUM**

The Court issues this memorandum in conjunction with the written Judgment of Sentence to memorialize its policy disagreement with the methamphetamine trafficking guidelines and set forth the Court's methodology for sentencing in methamphetamine cases.

**I**

This is a nine-defendant methamphetamine conspiracy case. Defendant Noel Francisco Saldana was indicted on a multi-count Indictment and subsequently charged in a Superseding Indictment. Defendant entered a plea to Count One of the Superseding Indictment, which charged him with conspiring to possess and distribute 50 grams or more of methamphetamine, a schedule II controlled substance, contrary to 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(A)(viii). The Court summarized the offense behavior at Sentencing on July 2, 2018 as follows:

> Between July 2016 and December 2017, Mr. Saldana headed a major methamphetamine distribution organization in West Michigan obtaining large quantities of the drug from co-defendant Jesus Ramirez-Luna, who got the drugs from a supplier in Mexico. Regular shipments were made to the Defendant sometimes on a biweekly basis, but certainly more than once a month.

Defendant's advisory guidelines were based on a total offense level 41, criminal history category V for advisory guidelines of 360 months to life, with a mandatory statutory minimum of 120 months. Defendant moved for a variance (ECF No. 312), arguing, in pertinent part, that the sentencing guidelines for pure methamphetamine are not justified by empirical data and lead to sentencing disparities (ECF No. 315 at PageID.1625-1626).

## II

The United States Sentencing Guidelines (U.S.S.G.) are the "starting point and the initial benchmark" for federal sentencing. *Gall v. United States,* 552 U.S. 37, 49 (2007); *United States v. McBride,* 434 F.3d 470, 475-76 (6th Cir. 2006). In practice, this means that a district court must begin at the proper base offense level, apply any applicable enhancements or reductions to arrive at the adjusted offense level, and use the resulting offense level with the appropriate criminal history category to arrive at a sentencing range. *United States v. Thompson,* 515 F.3d 556, 561 (6th Cir. 2008). "Once the district court has calculated the appropriate Guidelines range, it then considers that range in light of the other relevant § 3553(a) factors in fashioning the sentence." *Id.* The court must ultimately "impose a sentence sufficient, but not greater than necessary," to accomplish the goals of sentencing, including "to reflect the seriousness of the offense," "to promote respect for the law," "to provide just punishment for the offense," "to afford adequate deterrence to criminal conduct," and "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2); *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

In determining the base offense level, the Sentencing Guidelines have established a 10:1 ratio between pure or "actual" methamphetamine and an equivalent weight of methamphetamine mixture. The 10:1 ratio was first introduced in the 1989 Sentencing Guidelines. *United States v. Hartle*, No. 4:16-CV-00233-BLW, 2017 WL 2608221, at *2 (D. Idaho June 15, 2017). No

"empirical data from the Sentencing Commission or in the academic literature" appears to justify this ratio. *Id. See also United States v. Harry*, No. CR17-1017-LTS, 2018 WL 2717224, at \*4 (N.D. Iowa June 6, 2018) ("There seems to be no empirical evidence supporting the need for a drastically-increased sentence based solely on the purity of the methamphetamine at issue."), appeal filed, No. 18-2221 (8th Cir. June 6, 2018).

"Rather, these distinctions seem to be tiered to a similar 10:1 ratio used in the mandatory minimum sentences imposed by Congress." *Hartle, supra.* Congress first introduced the methamphetamine purity distinction in the 1988 Anti-Drug Abuse Act, in which the weight quantity of methamphetamine mixture triggering each mandatory minimum was set at ten times the quantity of the pure methamphetamine triggering that same statutory minimum penalty. *Id.* at \*2, n.2. The Sentencing Commission responded by amending the Guidelines to reflect the 10:1 mixture/pure substance ratio. *Id.* (citing U.S. Sentencing Comm'n, *Methamphetamine: Final Report*, at 7 (Nov. 1999)). The 10:1 ratio is "by its very nature, a product of political calculation and compromise rather than empirical analysis." *Id.*

The purpose for increasing a defendant's sentence based on drug purity was apparently "to punish defendants who have prominent roles in drug distribution." *United States v. Ibarra-Sandoval*, 265 F. Supp. 3d 1249, 1255 (D.N.M. 2017). An application note entitled "Upward Departure Based on Unusually High Purity" sets forth the following rationale:

> Trafficking in controlled substances, compounds, or mixtures of unusually high purity may warrant an upward departure, except in the case of PCP, amphetamine, methamphetamine, hydrocodone, or oxycodone for which the guideline itself provides for the consideration of purity (see the footnote to the Drug Quantity Table). *The purity of the controlled substance, particularly in the case of heroin, may be relevant in the sentencing process because it is probative of the defendant's role or position in the chain of distribution. Since controlled substances are often diluted and combined with other substances as they pass down the chain of distribution, the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source*

*of the drugs.*  As large quantities are normally associated with high purities, this factor is particularly relevant where smaller quantities are involved.

U.S.S.G. § 2D1.1, cmt. n.27(C) (emphasis added).

As the Supreme Court has noted, the Sentencing Commission "fills an important institutional role:  It has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise.'"  *Kimbrough*, 552 U.S. at 108-09 (citation omitted).  However, district courts may vary from the Guidelines on policy grounds.  *Id.* at 106-07 (holding that "district courts are free to deviate from the Guidelines based on disagreements with the crack/powder ratio").  In *Kimbrough*, the Supreme Court indicated that "a district court's decision to vary from the advisory Guidelines may attract greatest respect when the sentencing judge finds a particular case 'outside the heartland' to which the Commission intends individual Guidelines to apply."  552 U.S. at 89 (quoting *Rita v. United States*, 551 U.S. 338, 351 (2007)).  In *Spears v. United States*, 555 U.S. 261, 264 (2009), the Court further indicated that a guideline may be rejected on a categorical basis "and not simply based on an individualized determination that [it] yield[s] an excessive sentence in a particular case."  *Id.*  Policy disagreements with a guideline support a variance, even in "a mine-run case where there are no 'particular circumstances' that would otherwise justify a variance from the Guidelines' sentencing range."  *Id.* at 267.

This Court has reached a policy disagreement with the United States Sentencing Commission as to the Guidelines for trafficking in methamphetamine.[1]  The Court concludes that less deference is due these guidelines inasmuch as they lack empirical support, rely on a flawed premise, and result in disparate sentences.  A number of very careful opinions by other district

---

[1] The question of applying the methamphetamine trafficking guidelines previously came before the Court in *United States v. Alonzo Johnson*, 1:17-cr-89-01 (ECF No. 215).  That case is distinguishable on its facts from the conspiracy case now before the Court.

courts that have examined the issue inform this Court's view and conclusion. Most comprehensive is the decision in *United States v. Hayes*, 948 F. Supp. 2d 1009 (N.D. Iowa 2013). *See also Harry*, 2018 WL 2717224; *United States v. Nawanna*, No. CR 17-4019-MWB, 2018 WL 2021350 (N.D. Iowa May 1, 2018). It seems that Iowa is a hot bed of methamphetamine trafficking. For the year 2011, 18.1 percent of drug trafficking crimes nationwide were methamphetamine trafficking; however, for the same year in the Northern District of Iowa, the percentage was 72.3 percent, which suggests to the Court that the sentencing judges in Iowa are particularly sensitive to, and focused on, the application of the methamphetamine trafficking guidelines.

As set forth, *supra*, there appears to be no evidence of any empirical data or institutional expertise grounding these offense levels. The lack of supporting empirical evidence is reason alone for the Court to adopt the view of the courts in *Hayes*, *Harry* and *Nawanna* (and the authorities cited therein) that the methamphetamine trafficking guidelines are entitled to less deference.

Moreover, the methamphetamine trafficking guidelines are based on the flawed premise that equates drug purity with a greater role in the offense. While touted as a proxy for identifying major drug dealers, the quantity indicator of relative responsibility is ineffective, in light of changes in the drug trade. "'Due to increases in the average purity of methamphetamine sold today, purity is no longer an accurate indicator of a defendant's culpability or role in a drug enterprise.'" *Nawanna*, 2018 WL 2021350, at *8 (quoting *Hartle*, 2017 WL 2608221, at *1). The Guidelines treat "ice," described as "a form of methamphetamine that typically was 80 to 90 percent pure, as if it were 100 percent pure methamphetamine." *Id.* at *1, n.2. However, data from the Drug Enforcement Agency's 2017 National Drug Threat Assessment demonstrates that the average purity of methamphetamine has increased—while the price per gram has dropped—

from 2011 to 2016. *Id.* at *6. Specifically, from 2011 to 2016, the average purity of one gram of methamphetamine has ranged from a low of 85.5 percent in early 2011 to almost 95 percent in early 2014, and for the third quarter of 2016, averaged 93.5 percent pure. *Id.* "[B]ecause of the generally very high purity of methamphetamine available today at all levels of the distribution chain, virtually all defendants today face enhanced punishment for a factor present in virtually all methamphetamine cases." *Id.* at *8. The methamphetamine trafficking guidelines consequently subject all defendants to harsh treatment, regardless of a particular defendant's role and regardless of any scoring enhancement already accounting for a defendant's role in the offense.

Last, the methamphetamine trafficking guidelines result in sentencing ranges that are extraordinarily harsh. In 2017, the average and median length of imprisonment for methamphetamine offenders were 91 months and 72 months, respectively, higher than for any other drug. *Nawanna*, 2018 WL 2021350, at *7. Similarly, over 55 percent of methamphetamine offenders had base offense levels of 32 or higher under the Guidelines during the same period, as compared to approximately 33 percent of total drug offenders. *Id.* "The high average purity of methamphetamine combined with the arbitrary nature of testing means that sentencing enhancements for drug purity are applied capriciously." *Ibarra-Sandoval*, 265 F. Supp. 3d at 1256.

For these reasons, some district courts have decided that the advisory ranges in drug trafficking cases should be systematically reduced by one-third until the Guidelines are re-evaluated and adjusted. *United States v. Diaz*, No. 11-CR-00821-2 JG, 2013 WL 322243, at *18 (E.D.N.Y. Jan. 28, 2013); *accord Hayes*, 948 F. Supp. 2d at 1031-33. Another court has determined that the appropriate remedy is to "calculate an alternative Guidelines range, starting with a base offense level determined by reference to the methamphetamine mixture Guidelines and then applying any applicable increases or decreases to that base offense level." *Harry*, 2018

WL 2717224, at *5.  Another court concluded that it would "determine whether an enhancement based on purity is appropriate in each case." *Ibarra-Sandoval*, 265 F. Supp. 3d at 1256.  Yet another concluded that it would "routinely consider granting a variance in cases where drug purity testing has been completed" and "calculate[e] both guideline ranges and then determining, based upon all of the circumstances, what constitutes a reasonable sentence under the facts of the case." *Hartle*, 2017 WL 2608221, at *4.

This Court's methodology for sentencing in methamphetamine cases will be to treat all methamphetamine quantities as mixtures.  This Court had a policy disagreement with the Sentencing Commission on the cocaine sentencing guidelines, which this Court concluded supported sentencing on a 1:1 ratio, crack to powder cocaine, in all cases.  This Court likewise concludes that its policy disagreement with the Sentencing Commission on the methamphetamine sentencing guidelines supports sentencing all cases by considering all methamphetamine quantities to be methamphetamine mixtures.   The Court notes that even this modest change yields guideline ranges that are (a) higher than the ranges for similar ranges for heroin and cocaine, and (b) generally equivalent to the ranges for similar quantities of fentanyl and crack cocaine.  After calculating the guidelines using that formula, the Court will evaluate the question of variances under § 3553(a) on a case-by-case basis to achieve the statutory purpose of a sentence that is sufficient but not greater than necessary to satisfy goals of the statute.

This Court firmly believes that methamphetamine is a dangerous drug whose trafficking requires attention and punishment.  However, in heeding the statutory mandate to reach sentencing decisions that are sufficient but not greater than necessary to achieve the goals of just punishment, promote respect for the law, provide deterrence and protect the public, it is likewise an inescapable conclusion that the current methamphetamine trafficking guidelines fail to achieve that mandate.

Therefore, the Court gives less deference to the purity-based guidelines in the case at bar and instead starts with a base offense level determined by reference to the methamphetamine mixture Guidelines. The Court notes that Defendant Saldana received a four-level enhancement for being a leader in this offense (Final PSR, ECF No. 301 at PageID.1392-1393). This four-level enhancement adequately accounts for his role in the offense. The Court agrees with Defendant that there is no reason to use a guideline that lacks empirical support, relies on a flawed premise, and results in disparate sentences, to further increase his offense level based on his role in the offense (ECF No. 315 at PageID.1632).

## III

Accordingly, for the reasons stated herein and on the record on July 2, 2018, the Court determines that a term of 210 months of imprisonment is sufficient, but not greater than necessary, to serve the purposes of sentencing as delineated in § 3553(a)(2). Other conditions of Defendant's sentence appear in the Judgment of Sentence.


Dated:  July 3, 2018                                     /s/ Janet T. Neff
                                                        JANET T. NEFF
                                                        United States District Judge